UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Ramona E. Stenberg,

        Plaintiff,           **MEMORANDUM OPINION AND ORDER**

v.                                     Civil No. 07-4064 ADM/JJK

I.C. System, Inc.,

        Defendant.

_____

Arlo H. Vande Vegte, Esq., Arlo H. Vande Vegte, P.A., Long Lake, MN, on behalf of Plaintiff.

Norah E. Olson Bluvshtein, Esq., and Richard A. Ross, Esq., Fredrikson & Byron, P.A., Minneapolis, MN, on behalf of Defendant

_____

# I. INTRODUCTION

On February 17, 2009, the undersigned United States District Judge heard oral argument on Defendant I.C. System, Inc.'s ("I.C. System") Motion for Summary Judgment [Docket No. 13]. In her Complaint [Docket No. 1], Plaintiff Ramona E. Stenberg ("Stenberg") asserts claims of age discrimination and retaliation under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.01-.41; and claims of disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and the MHRA. For the reasons stated herein, Defendant's Motion is granted in part and denied in part.

# II. BACKGROUND[1]

**A.**    **Stenberg's Job Duties and Performance History**

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

I.C. System is a debt collection agency. Compl. ¶ 5; Answer [Docket No. 2] ¶ 6. Stenberg began working for I.C. System in February 1992; most recently, she worked for six years as a credit reporting representative. Compl.¶ 6; Olson Bluvshtein Aff., Dec. 29, 2008 [Docket No. 17], Ex. B (Stenberg Dep.) 43:25-44:6. As a credit reporting representative, Stenberg's duties included answering incoming calls from debtors, filling out Automated Consumer Dispute Verification reports ("ACDVs"), and persuading debtors to pay their debts. Stenberg Dep. 44:11-15, 45:2-46:3. In addition, Stenberg occasionally worked as a fill-in for "InstiCredit," a service I.C. System employs to provide credit reports to its clients. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. C (Erickson Dep.) 7:20-24.

I.C. System would periodically record the telephone calls taken by credit reporting representatives, including Stenberg. Id. 39:19-22. In addition, I.C. System measured the productivity of the credit reporting representatives based, in part, on the amount of debt they were able to collect each month. Stenberg Dep. 46:4-7. Supervisors would prepare performance evaluations and then meet with the credit reporting representatives to review the evaluation. Id. 27:7-16. In performance evaluations from February and November 2004, Stenberg's supervisor, Lisa Erickson, generally reflected that Stenberg met or exceeded expectations, including comments such as (1) "[Stenberg] is always willing to help out when needed and has done a great job on backing up InstiCredit" and (2) "[Stenberg] continues to work hard to increase her daily ACDV totals and has done a great job in backing up InstiCredit." Olson Bluvshtein Aff., Dec. 29, 2008, Exs. G, H. Erickson recorded, however, that Stenberg needed to improve on "[r]eceiving incoming debtor and third party . . . calls." Id. The February evaluation also notes that, on occasion, Stenberg's "professionalism slips which causes unnecessary call backs" and

that Stenberg "needs to maintain her professional demeanor at all times." Id., Ex. G. Similarly, the November evaluation states that Stenberg "need[s] to continue to work on avoiding call backs" and, at times, uses a "tone of voice [that] may seem condescending to debtors and causes call backs." Id., Ex. H.

Stenberg was given a written warning in early January 2005 for "[i]nappropriate behavior while on the phone with a debtor," after a debtor asked to speak to I.C. System's CEO and Stenberg "replied using the phrase CE 'No.'" Id., Ex. J. I.C. System recognized that Stenberg might have been intending to be humorous and not necessarily disdainful, but warned that her response was nevertheless inappropriate and cautioned that she needed to show "immediate and sustained improvement in [her] call behaviors and act as a professional at all times." Id.

In late 2005, Stenberg suffered a heart attack and was on medical leave from November 4, 2005, until December 25, 2005. Compl. ¶ 10; Stenberg Dep. 35:17-36:25. When Stenberg returned to work, her doctor limited her to a 20-hour work week, however Stenberg typically worked closer to 30 to 35 hours per week throughout the first half of 2006. Stenberg Dep. 70:12-74:13. Shortly after her return from medical leave, Stenberg had a conversation with Erickson during which Erickson asked Stenberg if she planned on retiring that year. Id. 40:6-15; Vande Vegte Aff. [Docket No. 21], Ex. F (Erickson Dep.) 142:12-25. Stenberg also had a conversation with the director of the credit reporting department, Debbie Dumas, in February 2006, during which Dumas allegedly commented to Stenberg that her heart attack had cost I.C. System over $100,000 in medical costs. Stenberg Dep. 54:21-55:13.

A performance evaluation from January 2006, which Stenberg reviewed with Erickson in March 2006, rated Stenberg as having exceeded expectations in receiving incoming calls from

3

debtors and third parties. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. L. With regard to performance on ACDVs, Erickson stated that "[Stenberg] needs to continue to improve her daily ACDV average." Id. Also, the evaluation comments that Stenberg "has been working very hard to get her stats back up . . . . She had done a great job in helping out and backing up InstiCredit . . . . She is always willing to help out when needed . . . . I appreciate her hard work." Id.

**B.     Incidents Leading up to Stenberg's Termination**

In a March 29, 2006 phone call recorded by I.C. System, Stenberg apparently hung up on a debtor when the debtor would not give his account number. Id., Ex. M. Stenberg signed a "collector monitor form" that documented the call. Stenberg Dep. 109:7-12. Included on the form is the sentence, "I will never [hang up] on a debtor again!!"; Stenberg testified that this sentence was not on the form when she signed it. Id. 111:20-23 (alteration in original).

In either April or May 2006, Stenberg told Erickson that she did not want to continue working as a fill-in with InstiCredit because doing so was having a negative impact on her ability to meet monthly collection goals, be eligible for bonuses, and "keep up with the ACDVs." Id. 46:13-24; Olson Bluvshtein Aff., Dec. 29, 2008, Ex. O. Alternatively, Stenberg asked that the time she spent on InstiCredit be excluded from the calculations of her performance numbers, but Erickson refused. Id. 47:1-8.

On May 17, 2006, Stenberg "clocked out" fifteen minutes after her shift ended. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. P. The next day, Erickson confronted her and told her that no overtime was available and that she would have to clock out fifteen minutes early that day to make up for the day before. Id. Although Stenberg did clock out early that day, she stayed at her desk working on ACDVs for an additional 20 minutes. Id. Erickson told her that it was

against company policy to work off the clock, and Stenberg responded that she was working on the ACDVs on her own time. Stenberg Dep. 101:12-102:11. When Erickson asked if Stenberg had worked off the clock in the past, Stenberg responded that she had, prompting Erickson to respond that she would need to know when that had occurred so Stenberg could be paid for that work. Id. 102:8-16. Stenberg replied that she did not really remember the various times that she had done so. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. P. Erickson repeated that working off the clock was against policy and told Stenberg not to do so anymore. Id. At this point, Stenberg asked why Erickson was making such an issue out of working off the clock when other credit reporting representatives did the same thing. Id.

Erickson prepared an employee warning report regarding the May 18 incident in which she stated that "[Stenberg] has been working off the clock in an attempt to meet her production standards. This is not acceptable and needs to stop immediately. When this situation was addressed with [Stenberg] she was argumentative. [Stenberg] may disagree with management[']s decisions[,] but she needs to be respectful of her supervisor." Id., Ex. Q. Erickson presented the report to Stenberg on May 19, 2006, and instructed Stenberg to sign it. Id. Stenberg told Erickson that she wanted time to formulate a response, but Erickson insisted that Stenberg sign the report immediately. Id. A representative from "Personnel" ultimately instructed Erickson to allow Stenberg to file her written response in lieu of signing that report. Id. In her written response dated May 20, 2006, Stenberg explained that working off the clock to meet ACDVs was a routine practice in her department, that others who had worked off the clock had not been disciplined, and that she did not know that working off the clock was against company policy. Id. Additionally, Stenberg commented, "While I do not imagine anyone capable of

5

discriminating against me because of my recent medical disability, or my age, I am becoming increasingly concerned about the motivation behind Ms. Erickson's actions toward me since my return to work." Id.

On May 30, 2006, Erickson met with Stenberg to review a tape recording of a phone call claimed to have occurred on May 18, 2006, during which Stenberg allegedly hung up on a debtor.[2] Stenberg Dep. 114:17-19. Erickson's written report states that "[Stenberg] again hung up on a debtor in one of her calls. Her update indicated the debtor hung up instead of her hanging up on the debtor. . . . [Stenberg] knows that this is inappropriate behavior when taking phone calls." Olson Bluvshtein Aff., Dec. 29, 2008, Ex. T. Erickson warned that "[n]o further incidents of [Stenberg] disconnecting a call on a debtor . . . will be tolerated." Id.

## C. Reduction in Force ("RIF")

In March 2006, I.C. System hired two new credit reporting representatives, James Anderson and William Rebke. Erickson Dep. 103:12-21. In May 2006, however, I.C. System's CFO informed Dumas that a decision had been made to eliminate two positions. Id., Ex. D (Dumas Dep.) 37:17-38:14. This decision to eliminate two credit reporting representatives was communicated to Dumas orally and there apparently are no written documents evidencing the decision. Id. 39:1-2. I.C. System did not have a policy to determine who to terminate, and thus, that decision was left to Dumas, who chose to decide who to terminate based on productivity. Id. 39:3-19. Dumas conferred with Erickson, and the two had several meetings to review the

---

[2] During Stenberg's deposition, I.C. System played a tape recording of the May 18 phone call; Stenberg admits that her voice was on the recording but denies that the recording played at her deposition was the same recording that was played during the May 30, 2006 meeting with Erickson. Stenberg Dep. 118:25-119:5; Olson Bluvshtein Aff., Dec. 29, 2008, Ex. U.

6

productivity numbers before deciding which representatives would be terminated. Erickson Dep. 99:22-102:25. The vice president of human resources, Mary Guthrie, was also consulted about the termination decision, but Guthrie has essentially no recollection of her involvement in the decision other than she recalls more than one discussion with Dumas and that she looked at some spreadsheets regarding productivity numbers. Vande Vegte Aff., Ex. E (Guthrie Dep.) 31:2-37:24.

The productivity analysis that Dumas and Erickson implemented to decide who to terminate was based on dollars collected and ACDVs processed, with dollars collected accounting for 70% of the productivity analysis and ACDVs accounting for the other 30%. Dumas Dep. 46:3-47:23. Productivity was the dominant factor but "minimal" consideration was also given to performance and behavior issues, although Dumas has no recollection of looking at personnel records or written warnings issued to credit reporting representatives. Id. 50:13-51:12. Based on their productivity analysis, Dumas and Erickson determined that the two representatives to be terminated were those with the lowest productivity, Stenberg and Jean Wardin. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. W. I.C. System notified Stenberg on June 1, 2006, that she had been terminated. Compl. ¶ 7.

**D.     Stenberg's Charge of Discrimination**

On July 18, 2006, Stenberg filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). Olson Bluvshtein Aff., Dec. 29, 2008, Ex. Z (EEOC Charge). She claimed that I.C. System retaliated and discriminated against her on the basis of age and disability. Id. In response to I.C. System's proffered non-discriminatory explanation that Stenberg was terminated pursuant to a RIF and because she was one of the lowest

performers in terms of productivity, Stenberg claimed, among other things, that the productivity analysis prepared by Dumas and Erickson was inaccurate because it failed to make adjustments to account for her medical leave and the reduced schedule she worked for much of the first part of 2006. Stenberg Dep. 64:3-23. Additionally, she faulted the productivity analysis for not considering that she had spent nearly half of her time working on InstiCredit instead of on collecting money from debtors and completing ACDVs. Id. Upon completion of its investigation, the EEOC found reasonable cause to believe that I.C. System discriminated or retaliated against Stenberg and issued a right to sue letter. Olson Bluvshtein Aff., Dec. 29, 2008, Ex. BB.

### III. DISCUSSION

**A.  Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig, 54 F.3d at 470. The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.      McDonnell Douglas Burden-Shifting Analysis**

The parties agree that all of Stenberg's discrimination and retaliation claims (both age and disability) under the ADA, ADEA, and MHRA are not based on direct evidence and are therefore analyzed under the familiar burden-shifting framework described in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). See Baucum v. Holiday Cos., 428 F.3d 764, 766 (8th Cir. 2005) (applying the McDonnell Douglas framework to discrimination claims under the ADA, ADEA, and MHRA); Stewart v. Indep. Sch. Dist. No. 196, 481 F.3d 1034, 1042-43 (8th Cir. 2007) (stating that in the absence of direct evidence of retaliatory motive, retaliation claims under the ADA and the ADEA are analyzed under the McDonnell Douglas framework); Fletcher v. St. Paul Pioneer Press, 589 N.W.2d 96, 101-02 (Minn. 1999) (applying the McDonnell Douglas framework to a retaliation claim under the MHRA).  Under that framework, Stenberg must first establish a prima facie case of discrimination/retaliation. McDonnell Douglas, 411 U.S. at 802 (discrimination); Eliserio v. United Steelworkers of Am. Local 310, 398 F.3d 1071, 1078 (8th Cir. 2005) (retaliation).  If Stenberg establishes a prima facie case, the burden shifts to I.C. System to articulate a legitimate, nondiscriminatory/nonretaliatory reason for its actions.  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981) (nondiscriminatory); Brannum v. Mo. Dep't of Corrections, 518 F.3d 542, 548 (8th Cir. 2008) (nonretaliatory).  If I.C. System articulates such a reason, the burden shifts back to Stenberg to present evidence that I.C. System's proffered justification is mere pretext.  Libel v. Adventure Lands of Am., Inc., 482 F.3d 1028, 1034 (8th Cir. 2007).  The ultimate burden of proving unlawful discrimination remains on Stenberg.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993).

1.      **Disability Discrimination**

To establish a prima facie case of disability discrimination, Stenberg must show that "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job with or without reasonable accommodation, and (3) she suffered an adverse employment action under circumstances that give rise to an inference of unlawful discrimination based on disability." Heisler v. Metro. Council, 339 F.3d 622, 626-27 (8th Cir. 2003).

With regard to the first element, an individual is deemed disabled under the ADA if she (1) has a physical or mental impairment that substantially limits one or more major life activities, (2) has a record of such an impairment, or (3) is regarded as having such an impairment.[3] 42 U.S.C. § 12102(2). Stenberg confines her argument to the third category, that I.C. System regarded her disabled. To show that I.C. System regarded her as disabled, Stenberg must show either that I.C. System "mistakenly believed that [s]he had a physical impairment that substantially limits one or more major life activities, or that [I.C. System] mistakenly believed that an actual, nonlimiting impairment substantially limited one or more major life activities." Ollie v. Titan Tire Corp., 336 F.3d 680, 685 (2003) (citing Sutton v. United Air Lines, Inc., 527 U.S. 471, 489 (1999)). .

Stenberg argues that the question by Erickson in January 2006 about whether Stenberg intended to retire is evidence that I.C. System perceived that Stenberg was substantially limited in her ability "to perform what *they* considered to be a stressful job because of her heart attack." Pl.'s Mem. in Opp'n to Mot. for Summ. J. [Docket No. 19] at 38. Erickson testified that she

---

[3] The MHRA similarly defines disability, except the word "materially" is substituted for the word "substantially." Minn. Stat. § 363A.03, subd. 12.

asked the question about retirement because Stenberg had voiced concern over whether she "was going to be able to handle [the job] because it is so stressful." Erickson Dep. 142:12-143:12. Dumas testified: "[S]hortly after [Stenberg] returned from her leave . . . Erickson told me [Stenberg] was complaining [about] how stressful the job was, it wasn't good for her blood pressure, [and] she didn't know if she would be able to do it." Dumas Dep. 64:19-65:13. Taken in the light most favorable to Stenberg, the record arguably suggests that Erickson and Dumas may have perceived that Stenberg was unable to perform the job of credit reporting representative. The Eighth Circuit has held, however, that there is "a distinction between being regarded as an individual unqualified for a particular job because of a limiting physical impairment and being regarded as 'disabled' within the meaning of the ADA." Conant v. City of Hibbing, 271 F.3d 782, 785 (8th Cir. 2001). The question by Erickson fails to support a reasonable inference that I.C. System regarded Stenberg as "precluded from working a whole range or class of jobs."[4] Id. at 785-86. Nor does the alleged comment by Dumas about the costs I.C. System incurred as a result of Stenberg's heart attack support such an inference. Thus, the record fails to establish that I.C. System regarded her as disabled within the meaning of the ADA.

Because Stenberg has failed to establish the first element of her prima facie case, I.C. System's Motion for Summary Judgment is granted on Stenberg's disability discrimination

---

[4] Stenberg avers that in past layoffs, she had always been allowed to transfer to a different department but that I.C. System refused to allow her to be transferred after the May 2006 layoff. These circumstances, she contends, show that I.C. System perceived her as unable to perform a wide range of jobs. Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 38. Stenberg has not identified any evidence to support her averment, and the Court is not persuaded that it shows that I.C. System regarded her as disabled.

claims. See Kellogg v. Union Pac. R.R. Co., 233 F.3d 1083, 1086 (8th Cir. 2000) (stating that summary judgment is proper if a plaintiff fails to establish any element of his prima facie case).

   2.   **Age Discrimination**

To establish a prima facie case of age discrimination, Stenberg must show that (1) she was a member of a protected class, (2) she was otherwise qualified to perform her job, (3) she suffered an adverse employment action, and (4) she was replaced by someone substantially younger, Roeben v. BG Excelsior Ltd. P'ship, 545 F.3d 639, 642 (8th Cir. 2008), or other evidence exists sufficient to "create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion," O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 312 (1996). "The point of the prima facie case is to demonstrate that an adverse employment action occurred under circumstances which [give] rise to an inference of unlawful discrimination." Keathley v. Ameritech Corp., 187 F.3d 915, 921 (8th Cir. 1999). The first three elements are not in dispute. See Def.'s Mem. in Supp. of Mot. for Summ. J. [Docket No. 15] at 19. The dispute pivots on what is required under the fourth element and whether Stenberg has made the necessary showing.

*Requirements of a Prima Facie Case in the Context of a RIF*

Generally, a plaintiff satisfies the fourth element of a prima facie case of age discrimination by "producing evidence that a substantially younger worker replaced the plaintiff." Ward v. Int'l Paper Co., 509 F.3d 457, 461 (8th Cir. 2007); see also Golden v. Cretex Cos., Inc., 337 F. Supp. 2d 1164, 1168 (D. Minn. 2004). But when a termination occurs in the context of a RIF, the plaintiff is not replaced and, accordingly, the fourth element of a prima facie case requires the plaintiff to make the additional showing that age was a factor in the

employer's decision to terminate the plaintiff. See Ward, 509 F.3d at 460-61; Ahmed v. Am. Red Cross, 218 F.3d 932, 933 (8th Cir. 2000). Although satisfying the burden of making this additional showing can take many forms, a plaintiff usually does so "by presenting either statistical evidence (such as a pattern of forced early retirement or failure to promote older employees) or circumstantial evidence (such as comments and practices that suggest a preference for younger employees)." Golden, 337 F. Supp. 2d at 1168-69 (citations and quotations omitted).

Stenberg challenges whether the RIF was bona fide. Although "[a] plaintiff cannot argue that the defendant showed bad judgment" in deciding which employee to terminate as part of a RIF, "he can argue that the method used by the defendant showed that the defendant was not really trying to decide which employee had greater potential." Hillebrand v. M-Tron Indus., Inc., 827 F.2d 363, 367 (8th Cir. 1987) (quoting Christie v. Foremost Ins. Co., 785 F.2d 548, 587 (7th Cir. 1986)). Because I.C. System hired two new, substantially younger credit reporting representatives (Anderson and Rebke) only months before Stenberg and Wardin were terminated, Stenberg questions whether a genuine RIF took place. Pl.'s Mem. in Opp'n to Mot. for Summ. J. at 29. She contends that the timing of the hires suggests that Anderson and Repke were "brought into the department as part of a plan to mask age and/or disability discrimination by hiring two substantially younger people, inculcating them into the department's work structure for a short while[,] and then terminating the two oldest people in the department." Id. at 31. In addition, Stenberg argues that I.C. System's expanding revenues, customer base, locations, and total employees in recent years, as well as the lack of any written documentation of the decision to conduct a RIF, is evidence the RIF was a ruse. Id. at 31-33.

13

I.C. System responds that Stenberg's argument that the RIF was not genuine is "purely speculative." Def.'s Reply Mem. in Supp. of Mot. for Summ. J. [Docket No. 24] at 4. Specifically, I.C. System argues that the lack of any written memorialization of the RIF and the higher collection numbers in 2006 are irrelevant as it is undisputed the CFO directed Dumas to eliminate two of the credit reporting representatives. While the lack of a written memorialization does not, by itself, show that the RIF was not bona fide, the Hillebrand court did indicate that a lack of evidence of an objective plan detailing the reasons for the RIF and the manner in which the termination decision would be made was relevant to whether the RIF was genuine for purposes of determining whether to require the additional showing as the fourth element of a prima facie case. See 827 F.2d at 367-38. The Court does not agree with I.C. System that the collection numbers are irrelevant. Stenberg presented evidence that the funds collected by the credit reporting department in January, March, April, and May 2006 were greater than the funds collected in the same months in 2005.[5] See Erickson Dep. 114:5-116:15, Ex. 63; Pamela Vande Vegte Aff. [Docket No. 22] ¶¶ 2-5. Although not dispositive—see Hardin v. Hussmann Corp., 45 F.3d 262, 265 (8th Cir. 1995) (noting that a defendant is not required to provide evidence of "financial distress" to show that an RIF was legitimate)—a lack of objective evidence of a business decline can give rise to a fact question regarding the genuineness of a RIF.[6] See id. at 367 (noting that an RIF is generally accompanied by "objective evidence of a

---

[5] The money collected in February 2006 was less than the money collected in February 2005, but the total from January through May 2006 exceeded the total from January through May 2005. Erickson Dep. 114:5-116:15, Ex. 63.

[6] The Court is mindful that its role is not to review the wisdom or fairness of I.C. System's business decision to conduct a RIF. See Hillebrand, 827 F.2d at 367. However Stenberg's challenge to the RIF is not one based on the wisdom or fairness of the decision to

business decline" and the lack of such evidence "militates against [the] claim of a genuine business decline"); Gaworski v. ITT Commercial Fin. Corp., 17 F.3d 1104, 1109-10 (8th Cir. 1994) (citing the fact that business had increased rather than decreased as raising a fact question of whether a RIF was genuine).

I.C. System's hiring of Anderson and Repke only a couple of months prior terminating Stenberg and Wardin, lends support to the claim that the RIF was not genuine. I.C. System argues that Stenberg has presented no evidence that Anderson and Repke were hired to replace her and, thus, the assertion that the hiring of Anderson and Repke casts doubt on the genuineness of the RIF "amounts to nothing more than a conspiracy theory that is totally unsupported by the facts." Def.'s Reply Mem. in Supp. of Mot. for Summ. J. at 5. That Stenberg has presented no direct evidence that Anderson and Repke were hired to replace her is not surprising and not dispositive. The circumstantial evidence mustered by Stenberg bearing on the genuineness of the RIF is sufficient to create a fact issue. On the evidence before the Court, reasonable minds could conclude that the purported RIF was not genuine and that Stenberg was replaced by the representatives hired only a couple of months before her termination. See Gaworski, 17 F.3d at 1110.

Given the fact issues regarding the genuineness of the RIF, Stenberg need only show that she was replaced by someone substantially younger to satisfy the fourth element of her prima facie case. Roeben, 545 F.3d at 642. Stenberg has carried this burden. At the time of her termination, Stenberg was 62 years old. Compl. ¶ 8. Wardin, the other individual who was

---

conduct the RIF or the manner in which it was carried out, but rather whether the RIF was genuine as opposed to merely a cover for discrimination.

terminated, was 71 years old. Erickson Dep., Ex. 64. Anderson and Repke, the two individuals hired a couple months earlier and alleged to be their replacements, were, respectively, 35 years old and 48 years old. Id. Thus, if Stenberg ultimately prevails on the fact issue regarding the genuineness of the RIF, such a determination will establish that she was replaced by someone at least fourteen years younger. The Eighth Circuit has indicated that a fourteen-year age difference is sufficient to infer age discrimination. See Girten v. McRentals, Inc., 337 F.3d 979, 982 (8th Cir. 2003) (citing Keathley, 187 F.3d 915).

*Legitimate, Nondiscriminatory Reason and Pretext*

I.C. System asserts that it terminated Stenberg for a legitimate, nondiscriminatory reason—namely, a decision had been made to reduce staff and, according to productivity calculations, Stenberg was one of the two lowest performers. Accordingly, to survive summary judgment, Stenberg must present evidence to suggest that I.C. System's proffered reason is pretext. Stenberg can make the requisite showing "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256. Stenberg argues that she has presented evidence to support the inference that (1) the RIF is "a contrived fiction used to hide the discriminations against her"; (2) I.C. System "came up with its 'productivity' formula, which was, itself, full of self-fulfilling bias," to "effectuate the RIF fiction"; (3) I.C. System "generated false disciplinary events within the last two weeks of employment in order to add weight to their terminations of the two oldest department employees"; and (4) younger employees with production numbers similar to Stenberg's and with instances of alleged misconduct similar to Stenberg's were treated more leniently. Pl.'s Mem. in

16

Opp'n to Mot. for Summ. J. at 39-40, 42.

Genuine issues of fact remain on whether the RIF was bona fide given the minimal amount of documentary evidence of a need and plan for a RIF, the lack of evidence of a decline in business and at least some evidence supporting an increase in business, and the hiring of two significantly younger credit reporting representatives only a couple of months prior to terminating the two oldest credit reporting representatives in the department. Accordingly, a jury should decide whether or not the proffered reason for Stenberg's termination, the RIF, is "unworthy of credence." Burdine, 450 U.S. at 256.

### 3. Retaliation

For a prima facie case of retaliation, Stenberg must show that she "'engaged in protected conduct, that [s]he suffered an adverse employment action, and that the adverse action was causally linked to the protected conduct.'" Putman v. Unity Health Sys., 348 F.3d 732, 737 (8th Cir. 2003) (quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999)). I.C. System concedes for purposes of this motion that Stenberg's May 20, 2006 letter responding to the written warning for working on ACDVs off the clock constitutes protected conduct, given Stenberg's reference in the letter to suspicions about possible discrimination. I.C. System also concedes that Stenberg's termination constitutes an adverse employment action. I.C. System argues, however, that Stenberg has failed establish the third element of her prima facie case, that the adverse action was causally linked to the protected conduct.

As evidence of a causal connection, Stenberg relies on the temporal proximity of her May 20, 2006 letter and the termination on June 1, 2006. Generally, temporal proximity is itself insufficient to create a genuine issue of fact on a retaliation claim. See Kiel, 169 F.3d at 1136.

17

But when the protected activity and the adverse employment action are "extremely close in time," such as two weeks, temporal proximity alone is "sufficient, but barely so," to establish the causation element of a prima facie case. See Smith v. Allen Health Sys., Inc., 302 F.3d 827, 833 (8th Cir. 2002). Here, as in Smith, the May 20, 2006 letter and the termination are very close in temporal proximity, amounting to less than two weeks, and is sufficient, by itself, to complete a prima facie case of discrimination.

I.C. System argues that two intervening events—the decision to cut staff and the review session with Erickson on May 30, 2006, of a tape-recorded phone call during which Stenberg hung up on a debtor—break the causal connection between the May 20, 2006 letter and Stenberg's termination on June 1, 2006. In Kiel, the Eighth Circuit held that a plaintiff's "intervening unprotected conduct" of insulting a superior and engaging in an angry outburst in the presence of coworkers "eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination." 169 F.3d at 1136. As this language makes clear, however, the relevant consideration is intervening conduct by the employee, not the employer. The decision to cut staff was intervening conduct by I.C. System, not Stenberg, and, thus, the principle described in Kiel is inapposite. Hanging up on a debtor during a phone call is conduct by Stenberg, but Stenberg has presented evidence that supports her assertion that if the decision to terminate her was based on her hanging up on a debtor, other, younger credit reporting representatives were disciplined more leniently for similar misconduct.[7] Specifically,

---

[7] Although I.C. System repeatedly points to certain behavioral misconduct by Stenberg, there is uncertainty whether the alleged misconduct played a role in the decision. Dumas testified that the she had no recollection of reviewing personnel records, that productivity had the most importance, and that at best, any behavioral issues had a minimal impact on the decision. Dumas Dep. 48:9-51:12.

Stenberg presented evidence that one representative in her mid-twenties was given a written warning in May 2006 for "[u]nprofessional conduct when speaking on the phone to a consumer," yet that representative was not terminated as part of the RIF. Erickson Dep. 159:24-161:16. Under the circumstances, the Court cannot say, as a matter of law, that the intervening events cited by I.C. System severs the causal connection suggested by the temporal proximity of the May 20 letter and the June 1 termination.

As with the age discrimination claims, I.C. System proffers the RIF as the legitimate, nondiscriminatory reason for Stenberg's termination. The fact issues pertaining to the RIF, noted in the discussion of pretext on Stenberg's age discrimination claims, see infra III.B.2, similarly preclude summary judgment on the issue of pretext on Stenberg's retaliation claims. I.C. System's Motion for Summary Judgment is therefore denied with respect to Stenberg's retaliation claims.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. I.C. System's Motion for Summary Judgment [Docket No. 13] is **GRANTED** with regard to Stenberg's disability discrimination claims;

2. I.C. System's Motion for Summary Judgment is **DENIED** with regard to Stenberg's age discrimination claims; and

3. I.C. System's Motion for Summary Judgment is **DENIED** with regard to Stenberg's retaliation claims.

BY THE COURT:

　　　s/Ann D. Montgomery　　
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 29, 2009.